NOT DESIGNATED FOR PUBLICATION

No. 122,280

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

AV HOMES, LLC,
*Appellee*,

v.

AMGUARD INSURANCE COMPANY,
*Appellant*.


MEMORANDUM OPINION


Appeal from Sedgwick District Court; DEBORAH HERNANDEZ MITCHELL, judge. Opinion filed August 20, 2021. Affirmed.

*Curtis O. Roggow, Jana V. Richards,* and *Michael C. Kirkham*, of Sanders Warren Russell & Scheer, LLP, of Overland Park, for appellant.

*Donald N. Peterson II, N. Russell Hazlewood,* and *Nathan R. Elliott*, of Graybill & Hazlewood LLC, of Wichita, for appellee.

Before MALONE, P.J., HILL and BUSER, JJ.


BUSER, J.: This is an appeal by AmGuard Insurance Company (AmGuard) of the district court's award of attorney fees to AV Homes, LLC (AV Homes). AV Homes owned and operated the Colony West apartment complex in Wichita, which was insured by a replacement cost insurance policy written by AmGuard. After a fire destroyed an apartment building in the complex, AV Homes filed an insurance claim with AmGuard. Because of a dispute with the insurance carrier, AV Homes entered into a contingency fee agreement with the Graybill & Hazlewood law firm (law firm) to sue AmGuard to

1

obtain proceeds from the AmGuard insurance policy. Ultimately, a consent judgment was filed in the district court which provided, in part, that AmGuard would pay the law firm's reasonable attorney fees. Both parties submitted the issue of the amount of attorney fees to the district court which, after an evidentiary hearing, awarded AV Homes attorney fees under K.S.A. 40-256 in the amount of $720,781.26.

On appeal, AmGuard claims that the amount of attorney fees awarded was unreasonable, especially given the district court's undue emphasis on the contingent fee agreement between AV Homes and its attorneys. Finding no abuse of discretion by the district court, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

After purchasing a 4-building, 56-unit apartment complex in Wichita, AV Homes insured the property by purchasing a replacement cost insurance policy. AV Homes bought the policy through an agent, M & M Financial Services, Inc. (M & M), but AmGuard wrote the policy. On May 22, 2017, five months after obtaining the policy, a tenant in one of the units left an unattended stove on and the building caught fire. The fire extensively damaged the entire structure, including the roof. The building had 20 rental units before the fire, but after the fire the entire building was unrentable.

AV Homes notified AmGuard of the fire and contracted with Belfor Property Restoration (Belfor) to secure the building. AmGuard assigned a third-party adjuster, Michael Teegarden, to work with Belfor to determine the cost to restore the building. In an email, Teegarden informed AV Homes that AmGuard would cover 100% of the loss, minus the deductible. Based on Teegarden's initial adjuster's report to AmGuard, he estimated the property loss at $983,087.02, less a $10,000 deductible, plus $65,000 in lost rents. Given Teegarden's assurance, AV Homes entered into a restoration contract with Belfor to rebuild the building.

2

A short time later, AmGuard notified Teegarden that the insurance company anticipated denying AV Homes' insurance claim. According to AmGuard, the denial would be based on a defense of misrepresentation in AV Homes' application for insurance. AmGuard indicated that, in AV Homes' application, it had stated there were 15 apartment units in the building when, in fact, there were 20 units. Upon Teegarden informing AV Homes about the expected denial, the company instructed Belfor to stop work on the restoration. After Belfor billed AV Homes for the restoration costs already incurred, the contractor filed a lien against AV Homes for nonpayment.

Shortly thereafter, Paul Prislupsky, an in-house adjuster for AmGuard, contacted AV Homes attempting to negotiate a settlement of the claim for $440,000. Prislupsky suggested that unless his offer was accepted within 48 hours it was likely that AmGuard would deny the claim.

AV Homes did not accept Prislupsky's settlement offer but decided to retain legal counsel. After two attorneys recommended the law firm, AV Homes contracted with the firm to prosecute its insurance claim. Relevant to this appeal, the employment contract indicated that AV Homes chose a "[b]lended" payment option, in which the firm would "receive compensation based upon the Attorney's respective invested hours multiplied by their hourly rates heretofore described [Graybill and Hazlewood billed at $350 and $300, respectively], or 40% of the Client's Net Recovery, whichever sum is greater."

On August 10, 2017, three months after the building caught fire, the law firm, on behalf of AV Homes, sued AmGuard for breach of contract. AV Homes also sued M & M, asserting that M & M breached its duty of care when it reported inaccurate information to AmGuard—which led to AV Homes' claim being ostensibly denied by the insurance company. AmGuard answered AV Homes' petition and denied its claim that AmGuard "promised to pay $1,022,689.56" as approved by AmGuard's adjuster. AmGuard stated:  "No agreement has been reached between the parties regarding the

3

subject loss nor has Am[Guard] made a final determination as to whether the loss is covered under the subject policy." In its answer, AmGuard raised the affirmative defense that AV Homes made a fraudulent material misrepresentation when applying for the insurance policy.

During the litigation, the City of Wichita (City) brought a criminal complaint against AV Homes for its failure to repair the damaged building. During the prosecution, the City informed AV Homes that the City could demolish the remains of the building and assess the costs against AV Homes.

Throughout the ensuing months, the law firm propounded written discovery to AmGuard and Teegarden's employer. Informal discovery, including witness interviews and document production, was also obtained from Belfor and M & M. The law firm also responded to discovery requests propounded by AmGuard and M & M. Additionally, expert witness disclosures relating to the issue of restoration costs were filed by the law firm.

In June 2018—one year after the filing of the lawsuit—Graybill and Hazlewood traveled to Pennsylvania to depose Teegarden and AmGuard's corporate representatives. See K.S.A. 2020 Supp. 60-230(b)(6). The depositions lasted two days with Graybill and Hazlewood sharing the responsibility of questioning the witnesses. The depositions were recessed because AmGuard's corporate representatives were not prepared to testify about certain topics. During the depositions, AmGuard's attorneys asked the law firm to provide an explanation for their legal position in the litigation. A five-page memorandum was prepared by the law firm which outlined AV Homes' litigation theories based on Kansas insurance law.

The law firm attempted to schedule another round of depositions, focusing on AmGuard executives identified by corporate witnesses who were involved in the

decision-making process of handling the AV Homes insurance claim. In response, AmGuard sought to delay or quash the depositions. After briefing and several hearings, the depositions were rescheduled.

Before the depositions resumed, however, the litigation was concluded when AmGuard consented to a judgment. On September 25, 2018, the district court granted judgment to AV Homes, and against AmGuard, in the amount of $1,300,517.59. Of particular importance to this appeal, the district court held AV Homes was "also entitled to recover its costs of the action from [AmGuard] including, but not limited to, a reasonable attorney's fee, in an amount to be determined." The district court also dismissed AV Homes' claim against M & M with prejudice.

In keeping with the employment contract, upon receipt of the judgment amount, AV Homes paid the law firm 40% of the judgment or $514,207.04 in attorney fees. The remaining 60% of the judgment was used to satisfy the lien against AV Homes and to demolish the fire-damaged building. AV Homes was required to demolish the building because during the year its condition had deteriorated and AV Homes "didn't have enough money to rebuild."

In October 2018, the law firm filed a bill of costs, requesting that AmGuard pay the attorney fees as set out in the preliminary settlement agreement and in keeping with the district court's order. In response, AmGuard contended the 40% contingency fee established in the contract between AV Homes and the law firm was not reasonable. Efforts at mediation and settlement negotiations regarding payment of the attorney fees were unsuccessful.

In July 2019, AV Homes moved for taxation of statutory fees and costs— including the costs incurred "to recover the costs of litigation necessary to establish its entitlement to the insurance proceeds as well as the cost of litigation necessary to

5

establish and recover its fees and expenses for prosecuting the action." In response, AmGuard criticized the amount of work undertaken by the law firm and argued that the fees were unreasonable. In particular, AmGuard stated that the district court "should reduce the attorney hours billed significantly because of the duplicative work performed, because of counsel's failure to segregate the tasks performed between the two [attorneys], and because of the exorbitant amount of time taken to accomplish the legal work performed given the experience level of the attorneys involved." AmGuard also argued the district court should give less weight to the fact that the attorney fees were sought on a contingency basis.

On September 26, 2019—one year after granting judgment to AV Homes—the district court held an evidentiary hearing on the motion for taxation of statutory fees and costs. Julio Vergel, one of the owners of AV Homes, and Hazlewood testified that the fee contract was "commercially reasonable." Blake Shuart, a Wichita attorney with 10 years' experience as a plaintiff's attorney, also testified on behalf of AV Homes after being retained as an expert on attorney fees by the company. Shuart testified at length regarding the application of the factors for determining the reasonableness of attorney fees under Rule 1.5(a) (2021 Kan. S. Ct. R. 327) of the Kansas Rules of Professional Conduct (KRPC). Upon reviewing the case materials, Shuart calculated a "reasonable fee" of $719,889.85—compared to the $720,781.52 calculation by AV Homes. He testified that the 40% contingency fee "should control in this matter" and the percentage "would be the standard fee for handling a case like this through the litigation fact discovery process." AmGuard did not call witnesses, offer exhibits, or suggest a reasonable fee amount at the evidentiary hearing.

The district court granted AV Homes' motion and awarded attorney fees and costs in the amount requested by AV Homes: $720,781.26. The district court found this fee was "reasonable in light of the complicated nature of the case and the timeframe it took to resolve it." This amount included the cost of litigating the recovery of the attorney fees.

6

AmGuard timely appeals.

## DISTRICT COURT'S AWARD OF ATTORNEY FEES

On appeal, AmGuard contends the district court abused its discretion because the amount of the award was unreasonable. In particular, AmGuard argues that the award violates K.S.A. 40-256, exceeds a reasonable hourly rate for this type of work in Kansas, and was erroneously based on the district court's overemphasis on the 40% contingent fee agreement. AmGuard argues that the award should have been based on the eight factors set forth in Rule 1.5(a).

In response, AV Homes contends the district court's award was reasonable given the "broad discretion afforded district courts in situations like the present case" and "[i]n light of the evidence demonstrating the complicated nature of the case, the peculiar exigencies created by AmGuard, and the timeframe it took to resolve the claim."

Our standard of review provides: "The amount of an attorney fee award is within the sound discretion of the district court and will not be disturbed absent a showing that the district court abused that discretion." *Johnson v. Westhoff Sand Co.*, 281 Kan. 930, Syl. ¶ 3, 135 P.3d 1127 (2006). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the district court; (2) it is based on an error of law; or (3) it is based on an error of fact. *Consolver v. Hotze*, 306 Kan. 561, 568-69, 395 P.3d 405 (2017). As the party asserting the district court abused its discretion, AmGuard bears the burden of showing such abuse of discretion. See *Gannon v. State*, 305 Kan. 850, 868, 390 P.3d 461 (2017).

The district court is vested with wide discretion to determine the amount and recipient of an award of attorney fees. For its part, an appellate court when reviewing an award of attorney fees does not reweigh the testimony or the evidence presented or

reassess the credibility of witnesses. Moreover, an award of attorney fees will not be set aside on appeal when supported by substantial competent evidence. *In re Marriage of Strieby*, 45 Kan. App. 2d 953, 973, 255 P.3d 34 (2011).

The Kansas Supreme Court has held that "a district court is considered an expert on the issue of attorney fees" and it "'may apply its own knowledge and professional experience in determining the value of services rendered.'" *Johnson*, 281 Kan. at 940. Similarly, "[a]ppellate courts are also experts on the reasonableness of attorney fees. However, we do not substitute our judgment for that of the district court on the amount of the fee unless 'in the interest of justice' we disagree with the district court." *Link, Inc. v. City of Hays*, 268 Kan. 372, 383, 997 P.2d 697 (2000) (quoting *Buchanan v. Employers Mutual Liability Ins. Co.*, 201 Kan. 666, Syl. ¶ 11, 443 P.2d 681 [1968]).

The Kansas statute controlling the issue of attorney fees in cases like this one is K.S.A. 40-256. This statute provides:

> "That in all actions hereafter commenced, in which judgment is rendered against any insurance company . . . , if it appear[s] from the evidence that such company . . . has refused without just cause or excuse to pay the full amount of such loss, the court in rendering such judgment shall allow the plaintiff *a reasonable sum* as an attorney's fee for services in such action, including proceeding upon appeal, to be recovered and collected as a part of the costs." (Emphasis added.)

What is a reasonable sum? Our Supreme Court has provided guidelines for resolving this question: "In determining the reasonableness of an attorney fee, including those awarded under K.S.A. 40-256, the factors in Rule 1.5(a) . . . of the Kansas Rules of Professional Conduct should be considered." *Johnson*, 281 Kan. 930, Syl. ¶ 6. Rule 1.5(a) provides:

"(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent." (2021 Kan. S. Ct. R. 327)

In its memorandum decision, the district court listed the "eight reasonableness factors" that comprise Rule 1.5(a) and appropriately stated that the court was required to analyze the facts of this attorney fees request in accordance with those eight factors. The district court then considered each individual factor based on the evidence presented at the hearing. This methodology is in full compliance with Kansas caselaw. See *Johnson*, 281 Kan. 930, Syl. ¶ 6. Of note, AmGuard did not present testimonial or documentary evidence at the hearing.

We will review the district court's ruling by individually considering the eight factors of Rule 1.5(a).

*The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly. (Rule 1.5[a][1])*

Under this factor, the district court was authorized to consider "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to

perform the legal service properly." Rule 1.5(a)(1). Regarding this factor, the district court concluded:

> "As testified to by Mr. Hazlewood several unique issues were raised by [AmGuard] in its defense of the claim including that the claim had never been denied. These unique defenses required a certain level of expertise to address each. [The law firm] specialize[s] in this area, however, despite this expertise significant additional research was required to determine the viability of these defenses. As such significant time, labor and expertise was employed during the prosecution of this case."

At the fee hearing, Shuart corroborated Hazlewood's testimony relating to this factor. Shuart's report, which was also admitted in evidence, summarized his opinions. First, Shuart opined that case strategy sessions by Graybill and Hazlewood were "absolutely instrumental" to analyze the "policy construction and the interplay between the facts and the policy language." In particular, Shuart noted that such strategy sessions were critical in preparing for depositions of key insurance executives in order to obtain corporate admissions and evidence in the case. Shuart also dismissed the notion that having two experienced lawyers working together was unnecessary, given that the conferences only occurred when important litigation matters were addressed, or when key depositions were taken.

Shuart also concluded that the case was "moderately complex as first-party insurance cases go, but both novel and difficult in the overall context of insurance and tort litigation." He opined that the skills of the attorneys to perform the legal services properly were shown by the favorable result obtained for AV Homes. As discussed in more detail later, the law firm was experienced in handling these types of insurance cases.

On appeal, AmGuard contends the district court erred because it "did not consider the duplicative, non-segregated work performed by [AV Homes'] counsel." Specifically,

10

AmGuard argues the district court did not consider the "many" billing statement entries in which the law firm performed "duplicative work." According to AmGuard: "Of the 605.80 hours set forth by [the law firm] in the Billing Statement, approximately 150 hours were billed for tasks of Graybill which were also performed by Hazlewood. This is important because the tasks performed did not call for more than one attorney."

AmGuard has the burden to designate a record sufficient to establish its claim and to present its points to our court. See *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013). AmGuard cites the entire 43-page billing statement to support this claim without identifying which entries were duplicative. This designation is insufficient. Moreover, while AmGuard asserts the duplicative nature of the law firm's work should not be compensated, it presented no evidence to controvert Shuart's expert opinion which showed the appropriateness of having two attorneys working together at important times during the litigation.

AmGuard also contends the law firm "did not segregate its work and billing between the two [d]efendants in this case." AmGuard correctly asserts that "[w]here several causes of action are joined and only some of them permit the award of attorney fees, the work on several causes must be segregated in determining an attorney fee award," quoting *DeSpiegelaere v. Killion*, 24 Kan. App. 2d 542, Syl. ¶ 1, 947 P.2d 1039 (1997). While AmGuard correctly relies on *DeSpiegelaere* to support its contention, it does not acknowledge the following exception in the opinion:

> "An exception to the duty of a prevailing party's attorney to segregate work on several causes of action arises when the attorney fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts." 24 Kan. App. 2d 542, Syl. ¶ 2.

11

In its petition, AV Homes alleged that "AmGuard is refusing to pay [AV Homes'] loss because it contends it received inaccurate information from M & M in relation to [AV Homes'] insurance application." Based on this information and the resulting claim dispute, AV Homes alleged that M & M breached its duty to obtain the insurance.

During the litigation, M & M filed a motion to bifurcate the trial. Importantly, in AmGuard's response in opposition to bifurcation, it argued that bifurcation "would needlessly complicate both discovery and trial of the claims being asserted by [AV Homes]." AmGuard reasoned:

> "[AV Homes'] Petition is stated in two counts. Both counts relate to the same occurrence and to the same alleged damages—that is, a fire loss to an apartment building . . . . Both legal theories (breach of contract against AmGuard and negligent failure to procure insurance against M & M) involve the same nexus of operative facts. . . . These issues of fact are intertwined in the entire case, including both counts against the two separate defendants."

AmGuard's argument against the bifurcation of the trial undermines its later argument that the district court should not have considered billing entries related to M & M because such entries were not segregated from claims relating to AV Homes.

The district court's finding regarding Rule 1.5(a)(1) was supported by substantial competent evidence and appropriately favored the law firm's position regarding the award of attorney fees.

*The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer. (Rule 1.5[a][2])*

Under this factor, the district court should consider "the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other

employment by the lawyer." Rule 1.5(a)(2). In analyzing this factor, the district court held: "As a result of the time invested in researching the novel defenses and seeking an early resolution to the case as was necessary for [AV Homes'] precarious financial condition, the firm was precluded from other employment."

AmGuard contends the district court's finding under this factor was unreasonable because " [Hazlewood] testified that he turns down cases that probably have merit every week" and AV Homes did not present "evidence supporting its contention that its attorneys turned away work because they were occupied with this case."

At the hearing, Hazlewood was asked about this factor and the following colloquy occurred:

> "Q. Given the risks from your end of signing a contract like this, do you have to turn down cases?
> . . . .
> "[HAZLEWOOD:] I turn down cases that probably have merit every week and—
> "Q. Explain why you have to do that.
> "[HAZLEWOOD:] Well, the reason I have to do it is that—and the reason no one else takes these kinds of cases or it is infrequently no one advertises for them is that you are making—there is usually a position being taken by an insurance company and you're making a first-party claim and they typically fight pretty hard when you sue them directly. In addition, the issues are usually fairly complicated and the client, because of the casualty that brought the client in the first place, they have no money to pay the lawyers. And so you're taking the risk and you have to not only evaluate the risk that you're going to be able to get past the insurance company and get the judgment, but you're also taking the risk that you have to trust the court to pay the fee. . . . And so there is a double risk there that makes these cases hard to take.

13

Although Hazlewood did not explicitly testify that he declined other legal representation to represent AV Homes, his testimony generically explained why he must decline other employment when representing clients suing their insurers in high-dollar litigation. Moreover, not only is this kind of litigation time-consuming, it may also involve collateral legal issues for the client. This point was made by Shuart when he noted that in addition to working on this litigation, the law firm assisted AV Homes with handling Belfor's lien against the property, "avoiding financial ruin through negotiation of interest-only mortgage payments," and arranging for the client's defense of the municipal prosecution for failure to repair the fire-damaged property.

We are persuaded that the district court's finding regarding Rule 1.5(a)(2) was supported by some evidence.

*The fee customarily charged in the locality for similar legal services. (Rule 1.5[a][3])*

Under this factor, the district court was to consider "the fee customarily charged in the locality for similar legal services." Rule 1.5(a)(3). Upon analyzing this factor, the district court determined: "The contingency percentage was the standard percentage used for contingency cases in this area."

On appeal, AmGuard does not dispute this factual finding. Rather, AmGuard contends Kansas precedent prohibits a contingency agreement from being "controlling or dispositive in determining a reasonable sum to be awarded," and "[t]his limited analysis by the district court demonstrates that the district court determined the contingency fee agreement was controlling and dispositive in determining the sum to be awarded to AV Homes." AmGuard's argument is more appropriately raised under Rule 1.5(a)(8). We will defer analysis of this argument to later in the opinion.

14

Substantial competent evidence supports the district court's finding. Hazlewood testified to the commonality and commercial reasonableness of the contingent fee percentage his firm used in this and other Kansas insurance cases. According to Shuart, the 40% contingent fee was "both reasonable and consistent with the rates charged by similarly-qualified firms across the state when litigating most any type of tort or first-party insurance case." Moreover, "[f]or a reasonably complex first-party insurance case involving losses over $1[million] that was litigated through the point of corporate executive depositions, 40% would be the customary rate." Finally, Shuart confirmed that Graybill's hourly rate ($350) and Hazlewood's hourly rate ($300) were "in line with those of similarly-skilled and experienced attorneys in this jurisdiction, particularly those who practice in an arena as highly specialized as first-party insurance litigation."

Whether considered in the context of a contingent fee, hourly fee, or blended fee, the district court was presented with evidence that the attorney fee agreement in this case was consonant with other similar attorney fee arrangements in Kansas.

*The amount involved and the results obtained. (Rule 1.5[a][4])*

As provided by this factor, the district court should consider "the amount involved and the results obtained." Rule 1.5(a)(4). In its memorandum decision, the district court found: "The firm was able to resolve the matter relatively quickly and get the plaintiff 100% of [its] loss in this case."

As summarized by Shuart, AV Homes

"sustained over $1[million] in losses, and the most recent offer (made verbally) prior to litigation was [$400,000]. It appears that this matter was extremely important to the firm's client, who did not have the means to self-indemnify for this loss. The ultimate result was the entry of [j]udgment against AmGuard in the sum of $1,300,517.59, plus [$15,000] in litigation expenses and reasonable attorney's fees. This result was exemplary."

15

AmGuard does not contest the district court's factual finding regarding Rule 1.5(a)(4). But it argues the award here "is so large as to not only be considered excessive, but also punitive and would award [AV Homes'] counsel a windfall because of its success in obtaining an early settlement."

Quoting *Evans v. Provident Life & Accident Ins.Co.*, 249 Kan. 248, 263, 815 P.2d 550 (1991), AmGuard argues the purpose of K.S.A. 40-256 is "'not to punish an insurance company but to permit the allowance of a fair and reasonable compensation to the assured's attorney.'" But in *Moore v. St. Paul Fire Mercury Ins. Co.*, 269 Kan. 272, 279, 3 P.3d 81 (2000), after our Supreme Court conducted a detailed analysis of attorney fee shifting statutes (both federal and state), the court held that "[t]he primary purpose of the Kansas fee-shifting statute [K.S.A. 40-256] *is to benefit the insured*." (Emphasis added.)

We do not discern that the district court intended to penalize AmGuard or award a windfall to AV Homes. Like the district court, we evaluate this factor in a straight-forward manner. The amount in controversy in this successful litigation was substantial, and AV Homes was fully compensated for its loss. Given this result, AmGuard has not shown the district court erred in its evaluation of Rule 1.5(a)(4).

*The time limitations imposed by the client or by the circumstances. (Rule 1.5[a][5])*

Pursuant to Rule 1.5(a)(5), the district court was required to consider the time limitation provided by the client or the circumstances. The district court found: "Due to the dire financial circumstances of [AV Homes] and the pending criminal case against [AV Homes] time was of the essence. This financial hardship made the necessity of an early resolution a priority for the firm which [the law firm was] able to achieve."

16

AmGuard complains:

"Again, the purpose of awarding attorney's fees under Section 40-256 is 'not to punish an insurance company but to permit the allowance of a fair and reasonable compensation to the assured's attorney.' . . . AmGuard's decision to consent to judgment should not be used against it in determination of awarding attorney's fees to [AV Homes]. The district court's analysis of this factor demonstrates that it is punishing AmGuard for its consent to early resolution of this case. [Citation omitted.]"

We disagree with AmGuard's characterization of the district court's finding. It is difficult to understand how the district court's analysis of this factor could be interpreted as constituting a punitive action against the insurance company.

The district court's findings under this factor are supported by substantial competent evidence. Vergel testified to the difficult financial straits that AV Homes and he incurred because of the fire, including being unable to pay the initial restoration costs after AmGuard notified him that it would likely decline coverage for the casualty. This resulted in Belfor placing a contractor's lien on the property. Additionally, Vergel discussed the lost rental income due to the apartment building being uninhabitable. Vergel's precarious financial condition necessitated the law firm negotiating an allowance for interest-only mortgage payments. Finally, the delay in restoring the building caused the City to prosecute AV Homes. Based on these considerations, according to Shuart, the law firm "expended a considerable number of hours developing a plan to resolve the case as early as possible." This was because, as Shuart testified, there was "inherently a time limitation in the form of [the law firm's] awareness that each month that the case went on was going to drive the client to a worse financial position."

We are persuaded that the district court's finding regarding KRPC 1.5(a)(5) was supported by substantial competent evidence.

17

*The nature and length of the professional relationship with the client. (Rule 1.5[a][6])*

This factor directs the district court to consider "the nature and length of the professional relationship with the client." Rule 1.5(a)(6). Regarding this factor, the district court concluded: "The nature and length of the professional relationship was for a standard time frame for a contingency case."

On appeal, AmGuard complains that "[g]iven the lack of a professional relationship with [AV Homes], the District Court should have found that this was not an important consideration for the district court" and the district court's analysis "demonstrates the district court's controlling and dispositive utilization of the contingency fee agreement and its improper construction of this factor."

Our review of the record reveals little evidence presented relating to the nature and length of the professional relationship between AV Homes and the law firm. Given the brevity and vagueness of AmGuard's argument, however, we are not persuaded that the district court improperly interpreted this factor to unfairly favor the contingent fee agreement executed in this case.

Shuart opined: "In the contingency fee setting, clients and firms do not often develop long-term engagements spread across several different matters. Such appears to be the case here. Regardless, this factor appears considerably less important than others."

The evidence supports the district court's finding that the professional relationship between AV Homes and the law firm was of a duration ordinarily found in these types of cases. In short, all parties seem to agree that this factor was less important than the other factors in the attorney fee analysis. We agree.

*The experience, reputation, and ability of the lawyer or lawyers performing the services. (Rule 1.5[a][7])*

Under this factor, the district court was authorized to consider "the experience, reputation, and ability of the lawyer or lawyers performing the services." Rule 1.5(a)(7). According to the district court: "As testified to in the hearing, [the law firm is] one of the few firms in this area who regularly handle cases against insurance companies. They have a solid reputation and consistently achieve positive results for their clients."

AmGuard does not challenge the qualifications or abilities of the law firm, but it takes the opportunity to claim that because the two lawyers were so experienced, they "spent an excessive and unreasonable amount of time on individual tasks given their combined years of experience in the area of property insurance coverage litigation." This argument was addressed in the section relating to Rule 1.5(a)(1).

There was considerable evidence presented through the testimony of Hazlewood and Shuart regarding the law firm's reputation, knowledge, and experience representing clients in significant first-party insurance litigation. The professional resumes of both Graybill and Hazlewood were admitted in evidence as exhibits, and both reflected considerable expertise in this specialized area of the law. Shuart opined that this factor weighed "strongly for" the fee request made by the law firm. The district court's finding was well supported by the evidence presented at the hearing.

*Whether the fee is fixed or contingent. (Rule 1.5[a][8])*

Under this factor, the district court was to consider "whether the fee is fixed or contingent." Rule 1.5(a)(8). The district court found that the law firm "took the case on a contingency basis which was imperative for [AV Homes] in this case. The case posed considerable financial risk to both the plaintiff and their attorneys and therefore the recovery is not excessive in light of this risk."

19

AmGuard contends the district court's award violated K.S.A. 40-256 because a "contingency fee agreement cannot be the sole factor considered in determining the amount of attorney's fees awarded to a litigant." AmGuard argues:

> "Here, a review of the District Court Memorandum of Decision demonstrates that the contingency fee agreement was controlling and dispositive in determining the sum to be awarded to AV Homes in this matter. The district court considered the contingency fee agreement in its analysis of several of the Rule 1.5(a) factors."

In response, AV Homes submits the district court properly considered all factors and did not abuse its discretion given controlling precedent and the "complicated nature of the case."

Both parties cite *Johnson* in support of their legal position. In *Johnson*, the Johnson family was involved in a personal injury automobile accident. The Johnsons filed a lawsuit against, among others, Westhoff Sand Company (Westhoff). The Johnsons agreed to retain counsel under a contingent fee contract that would pay their attorneys 33% of any recovery by way of settlement or trial or 40% in the event of an appeal.

Westhoff did not inform its insurance carrier, Mid-Continent Casualty Company (Mid-Continent), of the lawsuit. Subsequently, the insurance carrier learned of the lawsuit but was unable to contact its insured, Westhoff. Mid-Continent refused to provide insurance coverage or a defense at trial, resulting in a default judgment against Westhoff in the principal amount of almost $2.3 million.

The Johnsons contended that Westhoff's policy with Mid-Continent provided insurance coverage and sought to recover the full amount of the default judgment—including attorney fees. Westhoff initiated a garnishment action against Mid-Continent. The district court, upon finding the insurance carrier failed to provide Westhoff a defense

"without just cause or excuse" under K.S.A 40-256, ruled that Westhoff was entitled to collect the entire default judgment, plus interest, from Mid-Continent.

Mid-Continent appealed, our court affirmed, and remanded for a hearing on attorney fees with directions to consider the Rule 1.5(a) factors. An evidentiary hearing was held during which experts representing both parties testified and various exhibits were admitted in evidence. Of note, the Johnsons submitted an expert affidavit from Jacob Graybill in support of the reasonableness of the contingent fee agreement.

The district court awarded about $1.2 million in attorney fees which was approximately 33 1/3% of the judgment. Mid-Continent appealed the award, arguing the district court erred in considering the contingency fee contract when analyzing the Rule 1.5(a) factors. Our Supreme Court rejected this argument:

> "In short, [the carrier's] argument that a district court should not consider a contingency fee agreement when awarding fees under K.S.A. 40-256 is clearly inconsistent with KRPC 1.5(a). . . . [A] district court should consider such an agreement as one factor in awarding attorney fees. *If a court analyzes all of the applicable factors and arrives at a number that corresponds to an amount as computed under the agreement's formula, that number should not be deemed unreasonable per se.*" (Emphasis added.) 281 Kan. at 948.

See *Ortiz v. Biscanin*, 34 Kan. App. 2d 445, 471, 122 P.3d 365 (2004) (rejecting contention that contingency agreements may not be considered); see also *Hawkins v. Dennis*, 258 Kan. 329, 349-50, 905 P.2d 678 (1995) (affirming award that equated to the percentage in the contingency agreement); *City of Wichita v. Chapman*, 214 Kan. 575, 587, 521 P.2d 589 (1974) ("[T]he appellant argues that under *Wolf v. Mutual Benefit Health & Accident Association*, [188 Kan. 694, 366 P.2d 219 (1961)] the trial court could not consider the contingent fee contract as an element in determining the allowance of attorney fees. We do not agree.").

In *Johnson*, our Supreme Court affirmed the amount of the award, stating: "Although we recognize that the district court's award is high, our standard of review is not de novo. We cannot say that no reasonable person would agree with the decision of the district court." 281 Kan. at 950.

For its part, AV Homes also cites *Consolver* in support of the district court's award of fees in this case. In *Consolver*, the Kansas Supreme Court reaffirmed its guidance elucidated in *Johnson* regarding the analysis of the reasonability of contingent fee agreements. In *Consolver*, our Supreme Court considered whether a contingent fee was a reasonable fee under the doctrine of quantum meruit. 306 Kan. at 571-73. On appeal, our court found "[a] quantum meruit payment is fundamentally incompatible with a contingency fee in a contract for legal services." *Consovler v. Hotze*, 51 Kan. App. 2d 286, 291, 346 P.3d 1094 (2015), *rev'd* 306 Kan. 561. Upon a petition for review, our Supreme Court disagreed:

> "The panel's decision fails to recognize that [the attorney]—who was discharged without cause—assumed *in this case* some measure of risk that he would provide legal services and incur costs without payment if Consolver did not prevail. To begin from the premise that Consolver would recover entails a fair measure of hindsight bias. . . .
>
> "Likewise, to assert that the contingency fee 'premium' confers no benefit on a plaintiff simply ignores economic reality. Were it not for such premiums, many injured plaintiffs would be unable to obtain representation at all. . . . Shifting the risk of loss is widely understood to confer a significant economic benefit." *Consolver*, 306 Kan. at 571-72.

Having determined it was not error for the district court to consider the contingent fee agreement, our Supreme Court affirmed the district court's award, citing the district court's "broad discretion" in awarding attorney fees:

22

"We decline to formulate a precise standard for district courts to use in such situations. It is enough to say that *all* the factors identified in K.S.A. 2016 Supp. 7-121b(a) and KRPC 1.5(a) are relevant to the equitable determination of the reasonable value of legal services rendered. Given the district court's broad discretion in this area of the law, the district court's reliance on K.S.A. 2016 Supp. 7-121b(a) and KRPC 1.5(a), and the extensive fact-finding done by the district court, we see no reason to second-guess the outcome. The district court did not err as a matter of law and did not otherwise abuse its discretion." *Consolver*, 306 Kan. at 572-73.

Considered together, *Consolver* and *Johnson* provide us with important guidance in analyzing the contingent fee agreement in this case. AmGuard is correct that "the contingency fee agreement cannot be the sole factor considered." *Johnson*, 281 Kan. at 948. However, AV Homes is correct when it argues that, as detailed earlier in this opinion, the district court did not focus entirely on the contingent fee agreement. On the contrary, the district court made findings regarding each of the eight factors found in Rule 1.5(a). And only two of those factors (apart from this eighth factor) considered the contingent fee agreement.

Additionally, the other two factors evaluated by the district court required consideration of the contingent fee agreement. Under its analysis of Rule 1.5(a)(3), the district court found: "The contingency percentage was the standard percentage used for contingency cases in this area." In analyzing Rule 1.5(a)(6), the district court determined: "The nature and length of the professional relationship was for a standard time frame for a contingency case."

AmGuard does not favor us with an explanation as to why it was error for the district court to consider the contingent fee agreement as it related to these two factors. However, we are persuaded that the district court properly considered all eight factors in arriving at its decision regarding the reasonableness of the amount of attorney fees awarded.

AmGuard also argues "the amount of fees should be calculated based upon consideration of the hours worked, and rates charged because this reflects the reasonable value of services provided by [AV Homes'] counsel." AmGuard contends "consideration of the hours worked and the hourly rates set forth by [the attorneys] reflect the true, reasonable value of services provided by [AV Homes'] counsel."

In particular, AmGuard argues that the district court's award—when considered as an hourly rate, rather than a contingency fee—is "not a reasonable hourly rate for a Kansas attorney." It contends that if the district court divided the award by the number of hours worked by the law firm, the attorneys' hourly rate would be $857 per hour. This hourly rate, AmGuard asserts, is unreasonable. Based on the hourly rates listed in the agreement, AmGuard calculates that "the reasonable total sum of fees should be approximately $190,496.91, which is far less than the amount awarded by the District Court."

AV Homes counters that our Supreme Court's judgment in *Johnson* illustrates the fallacy of AmGuard's argument: "Although the *Johnson* opinion felt no need to convert the award to an hourly rate, doing the math yields a rate of $1,532 per hour ($1.3 million divided by 848.5 hours) before one considers inflation."

While a calculation of a lodestar amount may be beneficial to ensure that a contingent fee award is not overly excessive, it should constitute only one aspect of the totality of circumstances that comprise the eight factors of Rule 1.5(a). As the evidence presented at the hearing showed, the law firm took the considerable risk to represent AV Homes with knowledge that AmGuard was prepared to deny the claim in its entirety. AV Homes, on the other hand was financially unable to pay the law firm's attorney fees and litigation costs without a favorable outcome in its lawsuit. As noted in *Consolver*, the contingent fee premium afforded the law firm also provided the client a substantial benefit by shifting the risk of loss from AV Homes. See 306 Kan. at 571-72.

24

Given the broad discretion afforded to district courts in awarding attorney fees, our court may not set aside the award absent an abuse of discretion. AmGuard did not prove the district court committed an error of fact or law. Moreover, it cannot be said that no reasonable person would agree with the award because of the considerable testimonial and documentary evidence presented at the hearing in support of the award. Because the district court properly considered the eight factors of Rule 1.5(a) and its findings were supported by substantial competent evidence, we conclude the district court did not abuse its discretion in its award of attorney fees.

Affirmed.

\* \* \*

MALONE, J., concurring:  I concur in the result and agree that we have no basis to reverse or modify the district court's judgment for attorney fees in favor of AV Homes, LLC, based on the arguments presented on appeal by AmGuard Insurance Company.